**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3638 |
| | § | |
| TRANSOCEAN DEEPWATER DRILLING | § | |
| INC., | § | |
| | § | |
| Respondent. | § | |

**ORDER**

This case challenges the jurisdiction of the United States Chemical Safety and Hazard

Investigation Board ("CSB") to investigate the release of chemicals resulting from the May 2010

explosion and fire on the *Deepwater Horizon* drilling rig in the Gulf of Mexico at British

Petroleum's Macondo well.  The United States petitions to enforce subpoenas the CSB issued to

Transocean Deepwater Drilling, Inc. ("Transocean"), the rig owner.  Transocean has moved under

Federal Rule of Civil Procedure 12(b)(6) to dismiss the petition on the ground that the subpoenas

are unenforceable.  In the alternative, Transocean moves to quash the subpoenas.  (Docket Entry No.

23).  The court heard oral argument on these issues, (Docket Entry No. 43), and has considered the

motions, the accompanying briefing and exhibits, the arguments of counsel, and the relevant law.

For the reasons explained below, the motion to dismiss or to quash is denied.

**I.      Background**

This dispute arises from the explosion and fire on the offshore drilling rig *Deepwater*

*Horizon* on April 20, 2010.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of*

*Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS, at 2 (E.D. La. Feb. 22. 2012).  The April

20, 2010 blowout event did not immediately result in the release of oil into the water.  Instead, the

collapse of the riser structure created a flow path for the subsea discharge of crude oil approximately two days later. *See id.* at 2 & n.4 (explaining that Transocean's position is "that any oil that traveled up the riser to the deck of the MODU during th[e] time [of the blowout event] would have combusted in the fire before it could have entered the water").

Many governmental and other entities investigated the blowout, explosion, fire, and oil spill. The CSB issued five subpoenas at issue in this litigation, two on November 24, 2010, one on March 9, 2011, and two on April 7, 2011. (Docket Entry No. 1, Petition, ¶ 11). These subpoenas seek, among other things, all records collected by the Transocean internal investigation team. (*Id.*, ¶ 13). They also seek all records provided to the Joint Investigative Team, which consists of members of the United States Coast Guard and what was formerly the Mineral Management Service (now the Bureau of Ocean Energy Management Regulation and Enforcement), two federal agencies granted express authority to investigate the incident. (*Id.*, ¶ 15).

After Transocean was served with the CSB subpoenas, it took the position that the CSB lacked authority to investigate the Macondo incident. On October 12, 2011, Transocean told counsel for CSB and the United States that it would not comply with the subpoenas. The United States, on behalf of the CSB, filed the present petition under 28 U.S.C. § 1345 and 42 U.S.C. §§ 7412(r)(6)(A)–(S) and 7607(a), to enforce the administrative subpoenas. (Docket No. 1).

## II.    The Legal Standard

To enforce its administrative subpoenas in a federal district court, a governmental agency must show that: (1) the investigation will be conducted pursuant to a legitimate purpose; (2) the inquiry may be relevant to the purpose; (3) that the information sought is not already within the agency's possession; and (4) that internal administrative procedures have been followed. *See U.S. v. Powell*, 379 U.S. 48, 57–58 (1964); *Burlington N. R.R. Co. v. Office of Inspector Gen., R.,R. Ret.*

*Bd.*, 983 F.2d 631, 638 (5th Cir. 1993). When called on to enforce an administrative subpoena, a court must evaluate whether: (1) the subpoena was issued for a lawful purpose within the statutory authority of the issuing agency; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome. *See, e.g.*, *Okla. Press Publ. Co. v. Walling*, 327 U.S. 186, 209 (1946); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *Burlington N.*, 983 F.2d at 638 (citing *U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).

Courts should not enforce administrative subpoenas issued in an investigation if the agency lacks jurisdiction to investigate. *See, e.g.*, *E.E.O.C. v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) (quashing an administrative subpoena because agency's investigation exceeded its jurisdiction); *see also Marshall v. Burlington N., Inc.*, 595 F.2d 511, 513 (9th Cir. 1979); *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 491–92 (7th Cir. 1993). An administrative-enforcement proceeding is an appropriate forum for challenging an agency's jurisdiction. *See F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 587 (D.C. Cir. 2001); *see also Audubon Life Ins. Co. v. F.T.C.*, 543 F. Supp. 1362, 1367 (D.C. La. 1982). But a district court may not inquire into an agency's jurisdiction in an enforcement action so long as the material sought by the subpoena is not "plainly incompetent or irrelevant to any lawful purpose" of an agency. *Endicott Johnson*, 317 U.S. at 509.

The *Powell* standard is intended to be "a minimal burden" and one "which may be met by a simple affidavit filed with the petition to enforce." *United States v. Tex. Heart Inst.*, 755 F.2d 469, 474 (5th Cir. 1985); *see also Burlington N.*, 983 F.2d at 637 ("It is settled that the requirements for judicial enforcement of an administrative subpoena are minimal."). Because the United States established its prima facie case under *Powell*, the burden of going forward shifted to Transocean.

*See United States v. Wilson*, 864 F.2d 1219,1222 (5th Cir. 1989); *United States v. Davis*, 636 F.2d 1028,1034 (5th Cir. 1981).

## III.   Analysis

### A.   The Statutory Authority for the CSB's Investigation

The CSB is a federal agency created by the Clean Air Act ("CAA") Amendments of 1990, Pub. L. No. 101-549, 104 Stat. 2399.  *See* 40 C.F.R. § 1600.1.  The authorizing statute is codified at 42 U.S.C. § 7412(r)(6).  The statute gives the CSB authority to "investigate . . . the facts, conditions, and circumstances, and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages."  42 U.S.C. § 7412(r)(6)(C)(i).  "The term 'accidental release' means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source."  *Id.*, § 7412(r)(2)(A).  "The term 'stationary source' means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur."  *Id.*, § 7412(r)(2)(C).

The enabling statute also delineates investigative responsibilities between the CSB and other agencies:

> The [CSB] shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety.  The [CSB] shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related.  The [CSB] shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate.  The [CSB] shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities.  In no event shall the [CSB]

4

forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

*Id.*, § 7412(r)(6)(E).

### B. Whether the CAA Expressly Prohibits the CSB from the Type of Investigation at Issue

Transocean argues that the CAA expressly prohibits the CSB from investigating the Macondo incident because it was a "marine oil spill." Transocean argues that Congress expressly placed responsibility for investigating such incidents with the National Transportation Safety Board ("NTSB"). (Docket Entry No. 23, at 5). Transocean cites the statement that the CSB "shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate." 42 U.S.C. § 7412(r)(6)(E).

The United States argues that the CSB is not investigating a marine oil spill but rather the release of gases from the blowout and explosion. This court agrees. The proffered chronology — blowout, explosion, and fire followed by the collapse of the *Deepwater Horizon's* subsea riser, then the release of oil into the sea — does not convert the spill into one that is solely marine in nature, as opposed to one also involving airborne gases and their release. This court cannot conclude that the CSB's investigation is expressly prohibited by the CAA.

Transocean argues that the CSB is "masking its investigation as being 'limited to' substances released into the ambient air because all of the CSB's investigations are limited to accidental releases into 'ambient air.' By expressly prohibiting the CSB from investigating 'marine oil spills,' Congress could only have intended that the CSB be prohibited from investigating the accidental releases into 'ambient air' associated with marine oil spills. Therefore, the CSB is excluded from conducting an investigation of the Macondo incident." (Docket Entry No. 23, at 7–8 (emphasis omitted)). Transocean's reading does not present an accurate description of either the

CSB's proposed investigation or the relevant statute.  To the extent that certain marine oil spills are outside the CSB's jurisdiction, there would not seem to be jurisdiction to investigate an accompanying release of chemicals into the air from the oil that has leaked into the water.  In this case, however, the CSB was investigating the blowout, explosion, and release of airborne gases that preceded the release of oil from the well into the Gulf waters.

The statutory language Transocean cites is also inconsistent with its argument.  The cited language states that the CSB "shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate."  The CSB is not authorized to investigate certain spills.  Those are not all marine oil spills, but only those "spills, which" the NTSB is to investigate.  The statutory language indicates that the CSB is not authorized to investigate those marine oil spills that the NTSB is authorized to investigate, and that the CSB is authorized to investigate those spills that the NTSB is not authorized to investigate.  *See, e.g.*, *Gershenson v. Sec'y of Health & Human Servs.*, 1997 WL 79874, at *8 n.6 (Fed. Cl. Feb. 10, 1997) ("It is true that the word 'which' usually begins a nonrestrictive clause while the word 'that' usually antecedes a restrictive clause.  However, the acid test is not the stylistic indicator, but the import of the clause to the sentence.  Thus, if the absence of clause or phrase would significantly alter the meaning of the sentence it is nonrestrictive and should be separated by commas.  If the clause or phrase is essential to the meaning of the sentence commas are not necessary."); *Fujitsu Ltd. v. NETGEAR, Inc.*, 576 F. Supp. 2d 964, 969 (W.D. Wis. 2008) ("As a general rule, 'which' denotes a non-restrictive clause and would be set off by a comma.  Read in context in this claim, however, it is apparent that the patent applicants did not intend the word 'which' to be non-restrictive.  To the contrary, they intended it to indicate that the claimed invention does not involve the terminals that do not have a predefined priority.").

The language before the sentence Transocean relies on states that the CSB "shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the [NTSB] as the lead agency for the investigation of releases *which are transportation related*." 42 U.S.C. § 7412(r)(6)(E) (emphasis added).  This leaves a category of nontransportation-related marine oil spills — like the one in this case — outside the NTSB's exclusive authority.

After the language Transocean cites, § 7412(r)(6)(E) also states that "[i]n no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public."  *Id.*   Congress directed that the CSB not "forego" investigating accidental releases with such actual or potential consequences, leaving open the possibility that the CSB is authorized to investigate marine oil spills that are sufficiently grave.  And, as explained in the following paragraph, there appear to be certain marine oil spills that the NTSB lacks jurisdiction to investigate.  Were the CSB unable to investigate these spills, there would be a gap in the investigations Congress clearly intended to authorize.

Transocean argues that the NTSB was authorized to investigate the Macondo blowout, explosion, fire, and spill.  (*See* Docket Entry No. 23, at 6–8.)  The NTSB is authorized to investigate the following:

> (a)    General — (1) The National Transportation Safety Board shall investigate or have investigated (in detail the Board prescribes) and establish the facts, circumstances, and cause or probable cause of:
>
> . . . .
>
> (E)    a major marine casualty (except a casualty involving only public vessels) occurring on the navigable waters or territorial sea of the United States, or involving a vessel of the United States, under regulations prescribed jointly

7

by the Board and the head of the department in which the coast Guard is
operating; and

(F)    any other accident related to the transportation of individuals or property
when the Board decides —
    (i)      the accident is catastrophic;
    (ii)     the accident involves problems of a recurring character; or
    (iii)    the investigation of the accident would carry out this chapter.

49 U.S.C. § 1131.  "Major marine casualty means a casualty involving a vessel, other than a public

vessel that results in," among other things, "the loss of six or more lives."  49 C.F.R. § 850.5

(definitions for Coast Guard–NTSB Casualty Investigations).  Transocean argues that "a mobile

offshore drilling unit (MODU) such as the *Deepwater Horizon*, even when linked by a riser to a

fixed wellhead on the sea floor, is still considered to be a vessel underway under maritime law.

(Docket Entry No. 23, at 7 (citing 33 U.S.C. § 2003(g)–(h) (defining a "vessel" that is "underway");

*Garrett v. Higgenbotham*, 800 F.2d 1537 (11th Cir. 1986))).

There is Fifth Circuit support for the proposition that a MODU is a vessel.  *See, e.g.*, *Demette*

*v. Falcon Drilling Co.*, 280 F.3d 492, 498 n.18 (5th Cir. 2002) ("This circuit has repeatedly held that

special-purpose movable drilling rigs . . . are vessels within the meaning of admiralty law." (citations

omitted)), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d

778 (5th Cir. 2009).  There is also support for the proposition that a MODU continues to be a vessel

even when it is temporarily attached to the seabed for oil drilling.  *See id.* at 498.  The problem with

Transocean's argument is *where* this MODU was connected to the sea floor: some 50 miles off the

Louisiana coast.

Title 49 U.S.C. § 1101, which governs NTSB marine-casualty jurisdiction, applies the

definition of "navigable waters" found at 46 U.S.C. § 2010(17a), which "includes all waters of the

territorial sea of the United States as described in Presidential Proclamation No. 5928 of December

27, 1988."  According to Proclamation No. 5928, the "[t]erritorial sea of the United States is a

8

maritime zone extending beyond the land territory and internal waters of the United States" to a line "12 nautical miles from the baselines of the United States determined in accordance with international law." *See* Presidential Proclamation No. 5928, 54 Fed. Reg. 777 (Jan. 9, 1989). The proclamation defines "internal waters" of the United States as located inward from the point at which the territorial sea begins. *See id.*

The Macondo incident occurred on the Outer Continental Shelf in the Gulf of Mexico, approximately 50 miles from the United States coastline. (*See* Docket Entry No. 26, Ex. 2, 1 *Macondo Well Incident: Transocean Investigation Report*, at 2). Because this location was both outside the "internal waters of the United States" and beyond the 12 nautical mile limit of the "territorial sea of the United States" set out in Presidential Proclamation No. 5928, the incident did not occur on or under the "navigable waters . . . or the territorial sea of the United States," as required under 49 U.S.C. § 1131(a)(1)(E).

The *Deepwater Horizon* was also clearly connected to the Outer Continental Shelf at the time of the incident. Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, "[t]he term 'outer Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." *Id.*, § 1331(a). The OCSLA continues:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .

9

*Id.*, § 1333(a)(1).  In April 2010, the *Deepwater Horizon* was connected to the OCS by marine riser, meeting the situs requirement of § 1333(a).  *See, e.g.*, *Demette*, 280 F.3d at 498 ("Here, the situs requirement of section 1333(a)(1) is met.  The Fal-Rig # 85 was jacked-up over the OCS at the time of Demette's injury. It therefore falls into the second category of OCSLA situses: it was a device temporarily attached to the seabed, which was erected on the OCS for the purpose of drilling for oil.").  Because the Macondo incident occurred on an OCSLA situs, it did not occur "on the navigable waters or territorial sea of the United States."  *See* 49 U.S.C. § 1131(a)(1)(E).

Nor did the Macondo incident involve a "vessel of the United States."  *See id.*  Under 46 U.S.C. § 116, a "vessel of the United States" is "a vessel documented under chapter 121 of this title (or exempt from documentation under section 12102(c) of this title), numbered under chapter 123 of this title, or titled under the law of a State."  A "documented vessel" is "a vessel for which a certificate of documentation has been issued under chapter 121 of this title," 46 U.S.C. § 106, while a "numbered vessel" is "a vessel for which a number has been issued under chapter 123 of this title," 46 U.S.C. § 111; *see also* 46 C.F.R. § 4.40–5 ("*Vessel of the United States* means a vessel: (1) Documented or required to be documented under the laws of the United States; (2) Owned in the United States; or (3) Owned by a citizen or resident of the United States and not registered under a foreign flag.").  A vessel is eligible for United States documentation only if it is owned by a United States citizen or corporation and not documented under the laws of a foreign country.  *See* 46 U.S.C. § 12103(a)(1), (3).  The requirements of 46 U.S.C. § 12301(a), which provides that "[a]n undocumented vessel equipped with propulsion machinery of any kind shall have a number issued by the proper issuing authority in the State in which the vessel principally is operated," do not apply to foreign vessels temporarily using waters subject to United States jurisdiction.  *See* 33 C.F.R. § 173.11.  It is undisputed in this case that the *Deepwater Horizon* was Swiss-owned, registered

10

under the flag of the Marshall Islands, and ineligible for United States documentation, registration, or numbering.[1]  The *Deepwater Horizon* was not a vessel of the United States.

The Macondo incident may well have been a major marine casualty for NTSB-investigatory purposes.  But the incident did not occur on the navigable waters or territorial sea of the United States.  Nor did it involve a vessel of the United States.  *See* 49 U.S.C. § 1131(a)(1)(E).  The Macondo incident was not transportation-related; the MODU had been physically attached to the seabed and engaged in drilling activities for an extended period before the blowout.  *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS, at 2. The incident's catastrophic nature alone would not give rise to NTSB jurisdiction. *See* 49 U.S.C. § 1131(a)(1)(F); *see also* 42 U.S.C. § 7412(r)(6)(E) (providing that the NTSB must be designated as "lead agency for the investigation of releases which are transportation related").  To the extent that the CSB and the NTSB might have overlapping jurisdiction over some marine oil spills, it would appear that the NTSB lacked jurisdiction over this spill.

## C.   Whether the Macondo Incident Is Within the Scope of the CSB's Authority and Not Excluded by EPA Regulations

Transocean argues that the CSB lacks jurisdiction to investigate the Macondo incident under 42 U.S.C. § 7412(r).  Transocean cites regulations promulgated by the Environmental Protection Agency ("EPA"), the agency tasked with regulating under the CAA.  (Docket Entry No. 23, at 11). The EPA has promulgated Risk Management Program ("RMP") regulations, codified at 40 C.F.R. part 68, which relate to several § 7412(r) provisions.  These "Chemical Accidental Prevention

---

[1]  In addition, the exemption under 46 U.S.C. § 12102(c) is inapplicable as it pertains to barges engaged "in the coastwise trade, without being documented, on rivers, harbors, lakes (except the Great Lakes), canals, and inland waters." The Inland Navigation Rules Act ("INRA"), 33 U.S.C. § 2001 *et seq.*, cannot supply NTSB jurisdiction because the Macondo incident did not occur on the inland waters of the united states.  *See* 33 U.S.C. § 2003(*o*) (defining inland waters as the "navigable waters of the United States shoreward of the navigational demarcation lines dividing the high seas from harbors, rivers, and other inland waters of the United States.").

Provisions" address risk-management plans for preventing accidental chemical releases, as required by 42 U.S.C. § 7412(r)(7).  The regulations in 40 C.F.R. part 68 also establish, under the authority of 42 U.S.C. § 7412(r)(3)–(5), lists of hazardous and flammable regulated substances (and corresponding substance thresholds and other provisions) to determine the applicability of, and requirements for, the risk-management plans.

The parties dispute whether EPA regulations bind the CSB, which is an independent agency. (*See* Docket Entry No. 28, at 14 ("The Clean Air Act Amendments of 1990 ('CAAA') established CSB as an independent agency and do not authorize EPA to issue rules governing the CSB's investigative authority.")).  Assuming, without deciding, that as a general proposition the CSB could be bound by EPA regulations, the regulations at issue here do not remove the CSB's authority to investigate the Macondo incident, as Transocean asserts.

Transocean argues that "the EPA Administrator has determined that Section 7412(r) was not intended to apply to Outer Continental Shelf ("OCS") sources.  Transocean cites the following rules:

> § 68.10    Applicability.
>
> (f)    The provisions of this part shall not apply to an Outer Continental Shelf ("OCS") source, as defined in 40 C.F.R. § 55.2.
>
> § 68.100    Purpose.
>
> This subpart designates substances to be listed under section 112(r)(3), (4), and (5) of the Clean Air Act, as amended, identifies their threshold quantities, and establishes the requirements for petitioning to add or delete substances from        the list.

40 C.F.R. § 68.10; 68.100.  Transocean argues, for reasons similar to those discussed above, that "the *Deepwater Horizon* was an OCS source under applicable rules."  (Docket Entry No. 23, at 12).  Transocean also cites 40 C.F.R. § 68.3, which provides:

For the purposes of this part:

> *Stationary source* means any buildings, structures, equipment, installations, or substance emitting stationary activities which belong to the same industrial group, which are located on one or more contiguous properties, which are under the control of the same person (or persons under common control), and from which an accidental release may occur . . . . **A stationary source does not include naturally occurring hydrocarbon reservoirs**.

(Docket Entry No. 23, at 12 (emphasis in original)).  Transocean argues that "[t]he Macondo well was a naturally occurring hydrocarbon reservoir.  For this reason alone, the United States may not rely upon Section 7412(r) as a basis for jurisdiction here."  (*Id.*)  Transocean also cites the "List of Regulated Flammable Substances and Threshold Quantities for Accidental Release Prevention," 40 C.F.R. § 68.130, which Transocean describes as a list that "includes both chemical names and the threshold quantities that bring each substance within the scope of Section 7412(r).  (*Id.*)  Transocean argues that the United States's petition "references 'liquid hydrocarbons' and 'flammable gasses [*sic*]'" but that "[n]either of these substances are on the list in Part 68."  (*Id.* at 13).  Finally, Transocean argues that the liquid hydrocarbons and flammable gases such as methane, ethane, and propane — on which the CSB and the government rely in the petition — are regulated substances only if threshold quantities are present, and the petition does not allege specific quantities of those substances.  (*Id.*)

Transocean's arguments that the EPA regulations circumscribe the CSB's investigatory authority are unpersuasive.  By definition, part 68 applies to stationary-source owners or operators. *See* 40 C.F.R. § 68.10(a) ("Applicability.  An owner or operator of a stationary-source that has more than a threshold quantity of a regulated substance in a process . . . shall comply with the requirements of this part . . . .").  No party argues that the CSB qualifies as a stationary-source owner or operator under part 68.  *See id.*, § 68.10(3) ("Stationary source means any buildings, structures,

equipment, installations, or substances emitting stationary activities . . . .").[2]   The regulatory framework that Transocean cites imposes burdens on property owners and operators whose operations emit certain substances above certain levels.   The regulations do not circumscribe the CSB's operations.   Indeed, one CSB function is to make recommendations to the EPA about improving the rules designed to prevent chemical accidents.   *See* 42 U.S.C. § 7412(r)(6)(C)(ii), (H), (I), and (K); S. Rep. No. 101-228, at 229 (1989), 1990 U.S.C.C.A.N. 3385, 3613 (explaining the intent that the CSB serve as an "organizational stimulus" to EPA regulatory activity through the CSB's investigations and resulting recommendations.").   The EPA's regulations provide for CSB to make the findings and recommendations of its investigations available to the EPA to use to improve its rules.   The regulations do not limit the scope of those investigations, as Transocean argues.

The rules that Transocean cites support this understanding.   Technically, none applies to the CSB because part 68 applies only to stationary-source owners or operators.   *See* 40 C.F.R. § 68.10. Transocean is correct that the list of regulated substances in part 68 does not apply to the CSB's investigation of the Macondo incident, but that is because the CSB is not a stationary-source owner or operator, not because the Macondo incident occurred on the OCS.   *See id.*, § 68.10(f).

The part 68 list of regulated substances is a regulation that applies only to owners or operators of stationary sources.   *See* 40 C.F.R. § 68.10.   But the list of substances expressly states that it is called for under §§ 112(r)(3), (4), and (5) of the CAA,  which is codified in relevant part at § 7412.   *See id.*, § 68.100.   Under 42 U.S.C. §§ 7412(r)(2)(A) and (r)(6)(C)(i), the CSB is

_____

[2] Transocean's argument that the Macondo incident involved a naturally occurring hydrocarbon reservoir is also unpersuasive.  *See* 40 C.F.R. § 68.3.  The relevant stationary source was the *Deepwater Horizon* and its subsea riser, which allowed the naturally occurring hydrocarbon reservoir to blowout, explode up through the rig, and release gases into the air.  That is what the CSB proposed to investigate.  The CSB did not propose to investigate the spillage of hydrocarbons directly from the wellsite, or the release of those hydrocarbons through the water into the air.  (*See* Docket Entry No. 34, at 14 ("[The] CSB's jurisdiction is based on the integrated installation and not simply a naturally occurring hydrocarbon reservoirs thousands of feet beneath the seabed.")).

14

authorized to investigate an "accidental release" of a "regulated substance" *or* "other extremely hazardous substance." Because the Macondo incident involved the release of "extremely hazardous substances" under 42 U.S.C. § 7412(r)(2)(A), the United States need not demonstrate that a "regulated substance" was released. *See id.*

The term "extremely hazardous substances" is not defined in 42 U.S.C. § 7412. But § 7412 does state that in promulgating the list of "regulated substances" under § 7412(r)(3), the EPA "shall use, but is not limited to, the list of 'extremely hazardous substances' published under the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. § 11001 *et seq.*), with such modifications as the Administrator deems appropriate." The EPA has promulgated a list of "extremely hazardous substances" under the authority of the Emergency Planning and Community Right-to-Know Act, which is codified at 40 C.F.R. part 355. Transocean argues that crude oil and the byproducts of burning it are specifically excluded from CERCLA regulation and the list of "extremely hazardous substances" in 40 C.F.R. part 355. Methane, ethane, and propane, however, are regulated substances under 40 C.F.R. part 68. *See* 40 C.F.R. § 68.130, tbl. 3. Transocean does not argue that those gases are not regulated substances for purposes of § 7412(r).

Transocean argues that the EPA has imposed threshold quantities for methane, ethane, and propane. The EPA's RMP rule, however, lists threshold amounts to determine when a facility owner must develop an RMP. 40 C.F.R. §§ 68.150–68.185. Whether a substance is, by definition, a "regulated substance" does not turn on the presence of a threshold amount of that substance.

Transocean in effect argues that methane, ethane, and propane are regulated substances if present in threshold quantities but are not "extremely hazardous substances" if produced by the burning of crude oil. Even assuming this is true, the methane, ethane, and propane at issue here were not the byproduct of burning crude oil. Transocean acknowledged that the Macondo blowout caused flammable gases to erupt through the subsea riser, explode, destroy the *Deepwater Horizon*,

15

and enable the release of crude oil.  (See Docket Entry No. 28, at 21 n.11 ("As Transocean's own report makes clear, methane, ethane, and propane are not combustion products but were primary constituents of the release on April 20, 2010.").

In sum, none of the regulations Transocean cites indicate that the CSB lacks jurisdiction to investigate the Macondo incident.

### D.     Whether There is an Affirmative Grant of Jurisdiction to the CSB

In its reply brief, Transocean emphasized its argument that the CSB had not identified an explicit affirmative grant of jurisdiction to investigate the Macondo blowout and explosion. Transocean argued that even if the NTSB lacked jurisdiction to investigation, that could not create authority for the CSB to investigate.  (Docket Entry No. 31, at 1).[3]

"The authority of administrative agencies is constrained by the language of the statute they administer."  *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007).  "The statute creating or defining an administrative agency is the measure of its powers and duties.  Hence, while their powers are derived from, and they have the powers conferred on them by, valid statute, their powers are limited or circumscribed thereby, and they possess only such powers as are conferred on them by the constitution, or by statute . . . either expressly or . . . by implication from the grant of express powers."  73 C.J.S *Public Administrative Law and Procedure* § 107 (citations omitted).  Agencies are creatures of statute and cannot exceed the authority granted to them by the legislature.  *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (invalidating an agency determination to regulate tobacco products because the determination exceeded agency's statutory authority).  "An agency may not confer power upon itself.  To permit an agency to expand

---

[3] The government moved to strike Transocean's reply on the ground that this argument had not previously been raised.  (Docket Entry No. 34).  This court rejected the government's characterization of Transocean's argument and denied the motion to strike.  (Docket Entry No. 43, at 2).

its power in the face of a congressional limitation on its jurisdiction would be to grant the agency power to override Congress. This [the Supreme Court is] both unwilling and unable to do." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374–75 (1986).

Transocean argues that "[t]he CSB erroneously contends that, by virtue of its independence, it is free to declare the scope of its own authority and jurisdiction." (Docket Entry No. 31, at 1). But this appears to overstate the CSB's argument. The CSB argued that the EPA rules did not necessarily govern the scope of a CSB investigation, in part because the CSB is an independent agency with a separate enabling statute. The CSB did not argue that it was entitled to investigate beyond its statutory authority solely because it is an agency independent from the EPA.

Transocean argues that the CSB lacks jurisdiction to investigate based on the location of the release. The Macondo blowout and explosion happened approximately 50 miles off the Louisiana coast. The gases released entered the ambient air above the waters that cover the OCS. The OCS is, by definition, outside the territorial boundaries of any state. Transocean argues that the accidental release therefore occurred outside United States territory. The CSB's enabling statute is silent as to extraterritorial application. "[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949) (seeking enforcement of labor laws for United States workers in foreign countries). Because the release was purportedly extraterritorial, Transocean argues that the CSB lacks investigatory jurisdiction.

Assuming that § 7412 limits the CSB's investigative authority to United States territory, the Macondo blowout and explosion occurred within that limit. Under the OCSLA, "[t]he term 'outer Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 43 U.S.

17

§ 1331(a).  As noted above, the statute extends United States jurisdiction to "the subsoil and seabed of the outer Continental Shelf and to . . . all installations and other devices permanently or temporarily attached to the seabed, . . .for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources . . . ." *Id.*, § 1333(a)(1).  The *Deepwater Horizon* was connected to the OCS by marine riser and was an OCSLA situs.  *See, e.g.*, *Demette*, 280 F.3d at 498.  There is no issue of  extraterritorial application because the jurisdiction CSB seeks is territorial by virtue of the OCSLA.

In its reply brief, Transocean argues that other agencies have expressly been given CAA responsibilities with respect to the OCS.  The necessary implication, according to Transocean, is that Congress did not intend to give the CSB any jurisdiction over the OCS because § 7412(r) does not explicitly mention the OCS.  (Docket Entry No. 31, at 5–8.)  Several of the agencies Transocean cites — specifically, the EPA and the Department of the Interior's Bureau of Ocean Energy Management, Regulation & Enforcement — are given authority to regulate air emissions and ensure compliance with the National Ambient Air Quality Standards and to prevent significant air quality deterioration in onshore areas.  *See* 42 U.S.C. § 7627(a)(1)–(b); 43 U.S.C. § 1334(a)(8).  The statutes Transocean cites are silent as to investigatory authority over accidental releases of airborne substances.  Such releases are within the CSB's wheelhouse.[4]

---

[4]  Transocean has also cited that the fact agencies, including the Department of Homeland Security and the Bureau of Ocean Energy Management, have investigated the Macondo incident weighs against CSB jurisdiction.  (*See* Docket Entry No. 31, at 7–8; Docket Entry No. 43, at 10–11).  Transocean does not argue that the information the CSB seeks has already been disclosed because of these prior investigations.  *See Powell*, 379 U.S. at 57–58.  Transocean argues that the CSB's absence from inclusion in the group of investigating agencies' order convening a joint-investigation is evidence that the CSB must have lacked jurisdiction.  This argument is unpersuasive inasmuch as it turns on other agencies' interpretation of the scope of the CSB's authority.  Nor has Transocean explained why the CSB, Department of Homeland Security, and the Department of the Interior cannot share concurrent jurisdiction to investigate accidental releases.

Transocean also argues that the specific grant of investigative authority to the Coast Guard and Department of the Interior for the OCS precludes the CSB's jurisdiction.  43 U.S.C. §1348(d)(1) states that "[t]he Secretary [of the Interior] or the . . . Coast Guard . . . shall make an investigation and public report on each major fire and each major oil spillage occurring as a result of operations conducted pursuant to this Act."   There is no indication in this language that the investigative jurisdiction of the Coast Guard and Department of the Interior over the OCS is exclusive.  The OCSLA states that it is not to be construed as modifying any other law, which weighs against an interpretation that conflicts with the statute establishing the CSB.  *See* Pub. L. No. 95-372, Title VI, § 608(a), 92 Stat. 629, 698.  This provision was adopted in 1978, twelve years before the legislation establishing the CSB.  *See id.*, Title II, § 208, 92 Stat. at 649.  Even if there was a conflict, the later-passed law prevails.  *See, e.g.*, *Schmitt v. City of Detroit*, 395 F.3d 327, 330–31 (6th Cir. 2005).

Similarly, there is no language in CSB's enabling legislation stating that its jurisdiction is removed when the Coast Guard or Department of the Interior investigates an incident under the OCSLA.  Rather, the CSB's enabling legislation provides for coordination and cooperation with other agencies, as needed.

Transocean's reference to the authority of the Occupational Safety and Health Administration ("OSHA") and the United States Coast Guard over the OCS, (*see* Docket Entry No. 31, at 8), does not appear to bear on the CSB's jurisdiction.  The statute governing OSHA contains an explicit provision preempting its authority to regulate occupational health and safety when other agencies have been granted and have exercised authority to "prescribe or enforce standards or regulations affecting occupational safety and health."  *See* 29 U.S.C. § 653(b)(1).  Because the United States Coast Guard has been granted and exercised such authority with respect to workplace safety on the OCS, OSHA's regulatory authority over the OCS is limited.  *See generally Chao v. Mallard Bay Drilling, Inc.*, 534 U.S. 235 (2002).  Unlike the legislation governing OSHA, however,

there is no specific provision in the CSB's enabling legislation that preempts the agency's investigative authority.  Additionally, nothing in the OCSLA preempts the CSB's authority to investigate.  The OSHA preemption provision was intended to limit duplicative regulation and not to erect a blockade to safety improvements on the OCS and investigations toward that end.  The CSB's investigation includes examining the adequacy of the existing regulatory scheme — including, as described by Transocean, the current division of worker-safety oversight across different federal agencies, such as OSHA, the USCG, and the Department of the Interior.

Transocean cites recent legislative proposals that would explicitly give the CSB authority to investigate an "accidental fire, explosion, or release involving an offshore oil or gas exploration or production facility (regardless of whether there is a resulting marine oil spill)." (Docket Entry No. 31, at 9 n.2 (citing H.R. 501, 112th Cong. (2011)).  Reliance on proposed legislation overlooks the well-settled principle that such legislation may have been defeated or never enacted because "the existing legislation already incorporated the offered change."  *United States v. Wise*, 370 U.S. 405, 411 (1962).  In any event, "even if an inference as to the view of a subsequent Congress could be drawn from these proposals, only the views of the Congress that enacted the . . . Act are relevant. The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."  *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 348–49 (1963); *see also Interstate Natural Gas Co. v. Fed. Power Comm'n*, 156 F.2d 949, 952 (5th Cir. 1946) (nothing that a court should not consider the legislative history of a bill that has not been enacted into law); *Martin v. Comm'r, Soc. Sec. Admin.*, 82 F. App'x 453, 457 (6th Cir. 2003).

### E.      Whether the CSB Satisfied the Statutory Requirements to Investigate

Transocean argues that the CSB failed to satisfy the statutory requirements for its jurisdiction.  It argues first that the *Deepwater Horizon* was not a "stationary source." The argument is based on several statutes and regulations outside 42 U.S.C. § 7412(r)(2)(C).  (Docket Entry No.

31, at 14).  This argument is not persuasive.  The "installation" comprising the *Deepwater Horizon* and subsea riser is a "stationary source" under § 7412(r)(2)(C).  Because § 7412(r)(2)(C) provides a specific and unambiguous definition of "stationary source," there is no need to look to other statutes or regulations to interpret the statute's meaning.  *See United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004); *Carreri v. Jobs.com, Inc.*, 393 F.3d 508, 518–19 (5th Cir. 2004).  The Macondo drilling installation meets the definition of "stationary source" in § 7412(r)(2)(C).

Transocean argues that the CSB's assertion of jurisdiction over the Macondo incident conflicts with the limit on its authority to investigate releases to the "ambient air."  (Docket Entry No. 31, at 16).  The EPA defines "ambient air" as "that portion of the atmosphere, external to buildings, to which the general public has access."  40 C.F.R. § 50.1(e).  According to Transocean, "[a] release from the Macondo well is not a 'release to the ambient air' because the general public does not have access to Macondo well site, which is approximately forty miles offshore."  (Docket Entry No. 31, at 16).

Transocean's basis for its argument that the air was not publicly accessible is the distance from the Macondo well site to the shore.  Transocean essentially reads into 40 C.F.R. § 50.1(e) a requirement that air be promptly accessible to the general public.  Transocean cites no authority for this argument.  It does not appear to take into account the fact that air and the releases into it may quickly travel long distances to reach populated areas.  Nor does Transocean's argument take into account the fact that there are  onshore facilities — which Transocean does not question as capable of releasing substances into "ambient air" — that are just as remote and difficult to access, but are clearly subject to regulation.

In sum, the CSB has shown that it has jurisdiction to investigate the Macondo incident.  The subpoenas the CSB issued are within its authority.  Because Transocean raised no challenge to the

subpoenas other than the argument that the CSB exceeded its statutory authority, the motion to dismiss or to quash the subpoenas must be denied.

**IV.    Conclusion**

The motion to dismiss or to quash the subpoenas is denied.

SIGNED on March 30, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge